Filed 6/23/22  Sellers v. World Financial Group CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| BRITTANY SELLERS, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> WORLD FINANCIAL GROUP, INC., et al. <br><br>     Defendants and Appellants. | D078934 <br><br><br> (Super. Ct. No. 37-2019-00061048-CU-OE-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Katherine Bacal, Judge.  Affirmed.

Ogletree, Deakins, Nash, Smoak & Stewart, Spencer C. Skeen, Tim L. Johnson, Jesse C. Ferrantella, and Cameron O. Flynn for Defendants and Appellants.

Blanchard, Krasner & French, David C. Hawkes; Law Office of David A. Huch and David A. Huch for Plaintiff and Respondent.


INTRODUCTION

Brittany Sellers brought a class action lawsuit against World Financial Group, Inc. and World Financial Group Insurance Agency, Inc. (together,

WFG), asserting WFG unlawfully misclassified her and other WFG "associates" as independent contractors to avoid compliance with the California Labor Code. WFG moved to compel individual arbitration of Sellers' claims pursuant to the Federal Arbitration Act (FAA) and Code of Civil Procedure section 1281.2, to dismiss the putative class claims, and to stay the claim for civil penalties under the Labor Code Private Attorneys General Act of 2004 (PAGA) (Lab. Code,[1] § 2698 et seq.) pending the outcome of arbitration.

WFG asserted Sellers was bound by a valid and enforceable arbitration provision contained in an agreement she electronically signed via DocuSign to commence her relationship with WFG. The trial court denied WFG's motion to compel arbitration, finding the arbitration provision was both procedurally and substantively unconscionable. Because it further found the unconscionability permeated the arbitration provision, the trial court declined to sever the unconscionable terms, and determined the arbitration provision was unenforceable as a whole. On our independent review, we agree with the trial court's order denying WFG's motion to compel arbitration. We therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Sellers' Complaint*

As alleged in the operative Second Amended Complaint (SAC), WFG is "a multi-level marketing company selling investment, insurance, and various other financial products through a network of distributors." It operates

---

[1]     All further unspecified statutory references are to the Labor Code.

"nation-wide" with "approximately 3,500 offices in the United States, including many in California."

Sellers worked for WFG as an " 'associate' " from April 2018 through early 2019. To work for WFG, Sellers was required to sign a "non-negotiable" contract called an "Associate Membership Agreement" (AMA), which "set forth uniform [company] rules and policies." Upon signing the AMA, Sellers became a "member of WFG's independent sales force," "authorized to engage in the business of selling products" offered by WFG. WFG classified Sellers, and other associates like her, as independent contractors.

Sellers "recruit[ed] additional workers, [and] attempt[ed] to sell insurance and financial products to friends and family and new 'associates,' " as well as the general public. She, and other associates, were paid only commissions from the sales of WFG's financial and insurance products. She regularly worked more than 8 hours per day, and more than 40 hours per week, but was not paid an hourly wage and so was not paid minimum wage or overtime. If she did not close a sale in a given pay period, she did not receive any compensation.

Sellers alleged that, despite classifying her as an independent contractor, WFG "completely control[led] the overall operation of the business," including organizing the associates into a "hierarchy" and setting criteria for promotions from "Training Associates" to more advanced positions such as "Senior Marketing Director" and "retain[ing] the exclusive authority to hire and fire every associate." WFG also required her to work the "majority of her time" in a physical office, "usually" six to eight hours per day, five days per week; and to perform "non-selling tasks on a regular basis," such as attend "mandatory" sales meetings, training sessions, and work-related events outside normal working hours. Sellers alleged she received

3

"virtually no compensation" during "nearly an entire year" of working full time for WFG.

Sellers asserted WFG "unlawfully misclassified [her] and its other associates as independent contractors rather than properly classify[ing] them as employees in order to avoid compliance with [the] California Labor Code and other employer obligations, such as employment taxes, sick pay, benefits, and workers' compensation." She further alleged the AMA contained unlawful non-compete, non-solicitation, choice of law and forum selection provisions as conditions of employment.

Based on these allegations, Sellers filed this action in November 2019 and asserted nine causes of action in the SAC: (1) unlawful non-compete, non-solicitation, choice of law and forum selection provisions in employment agreements (Bus. & Prof. Code, § 16600; Lab. Code, § 925); (2) failure to pay minimum wage and hourly wages (§§ 221, 223, 1194, 1194.2, 1197, 1197.1); (3) forced purchases and failure to reimburse for necessary business expenses (§§ 221, 223, 224, 450, 2802); (4) failure to provide meal and rest periods (§§ 223, 226.7, 512, 1198); (5) failure to pay overtime (§§ 510, 1194); (6) failure to maintain accurate time records or itemized wage statements (§§ 226, 1174); (7) failure to pay compensation due at the time of separation (§§ 201, 202, 203); (8) unlawful and unfair business practices (Bus. & Prof. Code, § 17200 et seq.); and (9) a PAGA claim for civil penalties. She asserted the first cause of action on behalf of herself and a putative class of similarly-situated employees, and the ninth cause of action on behalf of herself, the State of California, and all aggrieved employees.

4

## II.

*WFG's Motion to Compel Arbitration*

WFG moved to compel individual arbitration of Sellers' claims based on an arbitration provision contained in the AMA. We begin our summary of the proceedings on WFG's motion by describing the AMA.

A.    *The AMA*

Sellers electronically signed the AMA as part of her employment application on April 4, 2018 through DocuSign.[2] The AMA was included in a larger electronic packet titled, "U.S. Associate Membership Agreement and Application" (the packet). The packet consists of 17 pages and, at the front, there was a one-page "Easy Guide To Completing the AMA," followed by a two-page "Applicant Profile" that Sellers completed. (Some capitalization omitted.) There were then two pages spelling out numerous "Acknowledgements," each signed or initialed by Sellers, including one that stated: "I acknowledge and understand that the application section of this agreement is not a legal, binding contract and the submission of this application does not entitle me to any compensation, rights, or benefits. Before I become entitled to receive any compensation on license-required products, I must sign the World Financial Group Associate Membership Agreement, Insurance Agency contracts, Broker/Dealer contracts and/or Product Provider contracts, and obtain the necessary licenses." (Some capitalization omitted.)

---

[2]    DocuSign is an internet-based contract management platform that allows companies and individuals to view and sign documents online in an electronic format. Andrew Schaad, WFG's Director of Operations, submitted a declaration in support of WFG's motion to compel arbitration, and attached a copy of the AMA signed by Sellers.

The AMA appeared next, beginning on page seven of the packet. It is six pages long and contained nine sections, each with a heading in boldface, with many of the sections containing multiple subparts. The text of the AMA is in single-space, small-type font: 9-point Times New Roman font.[3]

The AMA referenced arbitration in three provisions, on two separate and non-consecutive pages. The first two provisions appeared on page 4 of the AMA:[4]

**V. Arbitration of Grievances**

The Parties agree that, except as specifically provided to the contrary in this Agreement, any Grievance shall be resolved exclusively by Good Faith Arbitration.

**VI. Extraordinary Relief**

The Associate acknowledges that WFG would suffer extremely costly and irreparable harm, loss and damage if any of the provisions of this Agreement are violated by the Associate. The Associate agrees that WFG shall be entitled to seek Extraordinary Relief to temporarily enjoin violations by the Associate of this Agreement and that WFG may seek Extraordinary Relief in the federal and state courts of the State of Georgia, in any court of competent jurisdiction outside the State of Georgia, as well as in Good Faith Arbitration and if justice requires, in more than one of them, all without having to first comply with the requirements of Article V. The specifics of this Article VI shall not be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

The third reference to arbitration appeared on page five of the AMA, as the eighth of 15 subparts of a "**Miscellaneous**" section:

---

[3]    We determined the font type and font size by viewing the copy of the AMA included in the record in Microsoft Word. Our observation is consistent with the finding by the district court of the same AMA in *Yeomans v. World Fin. Grp. Ins. Agency, Inc.* (N.D. Cal. 2020) 485 F.Supp.3d 1168, 1185 (*Yeomans*) ["To be exact, the AMA is written in 9-point font."]). We discuss *Yeomans* in further detail, *post*.

[4]    We reproduce the relevant provisions of the AMA in the same 9-point Times New Roman font to show the actual size of the font type and font size of the AMA text. However, when viewing the copy of the AMA that is in the record, it is apparent the margins of the document are reduced to allow more text in each line, resulting in an overall denser appearance of the text. Because our standard margins are wider, we are unable to reproduce the same character spacing and wrap the text in the same lines as the AMA.

**H.**  If any part, section, clause, paragraph, term or provision of this Agreement shall be found to be void or unenforceable by any court or arbitration of competent jurisdiction, such finding shall have no effect upon any other part, section, clause, paragraph, term or provision of this Agreement.

The AMA did not reference arbitration beyond these three provisions, and did not, itself, define the capitalized term "Good Faith Arbitration." Instead, the packet included a separate four-page "GLOSSARY AND EXPLANATION OF TERMS" (Glossary), which appeared *after* the signature page for the AMA, on page 13 of the packet.  The reader is told of the existence of the Glossary on page five of the AMA under the miscellaneous section:

**A.**  All capitalized terms used but not otherwise defined herein shall have the meaning set forth in that certain Glossary and Explanation of Terms published by WFG and in effect as of the date of this Agreement, a copy of which Associate acknowledges receipt.  The Glossary and Explanation of Terms are contractual supplements to this Agreement that are binding on the Associate and by this reference are made part of this Agreement.  Any changes to the Glossary and Explanation of Terms shall be effective as of the date of general publication by WFG.

The separate Glossary contained 24 defined terms and the text is in the same single-spaced, 9-point Times New Roman font as the AMA.  Beginning on the bottom of the second page of the Glossary, and continuing on for most of the third page, there was an eight-part definition of the term " 'Good Faith Arbitration' " under section I.  The following three subparts were included in the definition:

1. General. All Grievances shall be resolved by Good Faith Arbitration in accordance with the Rules, except that, or in addition to such Rules: i) in order to assure neutrality and impartiality of the arbitrator(s), and to preserve the confidentiality of proprietary information, the arbitrator(s) shall not be any present or past owner, officer, director, employee, consultant, associate, agent, registered representative, attorney or other representative of any insurance company, insurance broker or insurance agency, securities broker, securities dealer or mortgage company, investment advisor, or of any affiliate of any of them; ii) the Parties may be entitled to such discovery and protective orders as provided herein; iii) the locale where the arbitration shall be held is the principal head office of WFG in Duluth, Georgia or, if that location is not convenient for all Parties, they shall try to devise a way so that it is convenient, or if that location cannot be made convenient, at such other place as the Parties may agree, or, if they cannot agree, then as may be set by the Rules, as the case may be: iv) a transcript shall be made on the proceeding; and v) the arbitrator's(s') award shall state their findings of fact and conclusions of law.

4. Waiver of Litigation. The Parties acknowledge and agree that, except as specifically provided to the contrary in this Agreement, this Section I is and shall be the Parties' exclusive remedy for any Grievance arising out of or relating to this Agreement, or the breach thereof.  It is the intent of the Parties that, except as specifically provided to the contrary in this Agreement, to the fullest extent allowed by law all Grievances, including any claims or defense (whether created or governed by federal, state or local law, rule or regulation) shall be resolved in an arbitral rather than a judicial forum.  It is understood by the Parties that it is to their mutual benefit to submit Grievances that they are unable to resolve themselves for resolution by a neutral referee in an arbitral rather than a judicial forum.  Those Parties recognize that by choosing Good Faith Arbitration as the mechanism for resolving Grievances, each Party expects to ensure a more expeditious and economical resolution of their Grievances than is available in most cases in a judicial forum.  Accordingly, except as specifically provided to the contrary in this Agreement, the Parties expressly waive the right to litigate in a judicial forum all Grievances and waive the right to trial by jury.  The Parties further agree that the

7

findings of fact issued by the arbitrator(s), as reviewed, if applicable, shall be binding on them in any subsequent arbitration, litigation or other proceeding.

     6. <u>Extraordinary Relief</u>. The Parties agree that WFG has the right to seek preliminary and temporary restraining orders, injunctions and other extraordinary relief (such orders, injunctions and other relief referred to as "Extraordinary Relief") under Article VI of this Agreement without complying with Article V of the Agreement or this Section I.  Without limitation, the Parties agree that the requirements for Good Faith Arbitration under Article V of the Agreement or this Section do not preclude WFG from seeking in an arbitral or in a judicial forum, or in both, Extraordinary Relief to protect its rights under Article VI of the Agreement. Neither Article V of the Agreement or this Section I shall be deemed to preclude or narrow the judicial or arbitral powers regarding Extraordinary Relief.

The following provision regarding equitable relief was set forth under section D, subpart 7, related to " <u>'Covenants'</u> ":

     7. <u>Equitable Relief</u>. The Associate acknowledges and agrees that, in the event that he/she were to violate or threaten to violate any of the Covenants, WFG's recovery of damages would be inadequate to protect WFG. Accordingly, the Associate agrees that, in the event of a violation, actual or threatened, of any such Covenants, WFG shall be entitled to injunctive relief and specific performance, notwithstanding any other provision of this Agreement to the contrary.  The Associate acknowledges and agrees that injunctive relief and specific performance are appropriate and necessary in the event of a violation, actual or threatened, of such covenants because there may be no adequate remedy at law for violation of any of such Covenants in that, among other reasons, the property rights of WFG which are protected by such covenants are unique assets which cannot be readily replaced in any reasonable period of time or in any other way adequately protected.

Although the Glossary stated that "All Grievances shall be resolved by Good Faith Arbitration in accordance with the Rules" on page two, the term " <u>'Rules'</u> " was separately defined on the last page of the Glossary, as "the Commercial Arbitration Rules of the American Arbitration Association, as in effect at the time of the occurrence of any Grievance" (the AAA rules).  The AAA rules, though, were not provided as part of the packet.  Nor did the AMA or Glossary include an instruction or hyperlink to where they could be found.[5]

WFG asserted the arbitration provision in the AMA was valid and enforceable against Sellers and her claims.  It further asserted, to the extent the trial court concluded any part of the arbitration provision was not

---

[5]    WFG provided a copy of the then-current AAA rules, which spanned approximately 46 pages of primarily single-spaced text, as an attachment to a declaration in support of its motion to compel arbitration.

8

enforceable, the trial court should sever those parts and enforce the remainder of the arbitration provision.

B.      *The* Yeomans *Decision*

In September 2020, approximately two months after WFG filed its motion to compel arbitration of Sellers' claims, the United States District Court for the Northern District of California decided *Yeomans*. (*Yeomans, supra*, 485 F.Supp.3d 1168.) In that case, the district court denied WFG's similar motion to compel arbitration against a different set of WFG associates, based on the same arbitration provision contained in the same AMA that is before this court. (*Id.* at p. 1191.)

The named plaintiffs in *Yeomans* began working for WFG in or before 2016, and filed a putative class action lawsuit against WFG in December 2018. (*Yeomans, supra,* 485 F.Supp.3d at pp. 1172, 1175, 1181.) They alleged WFG "recruit[ed]" individuals as associates " 'to build and operate their own financial services business.' " (*Id.* at p. 1173.) However, WFG conducted its business " 'by way of a massive pyramid scheme,' " in which the recruitment of new associates was one of the main factors to promotions, while it pressured associates to purchase and sell WFG's financial and insurance products to the new associates. (*Ibid.*) The *Yeomans* plaintiffs further alleged that WFG " 'unlawfully misclassified [a]ssociates as "independent contractors" rather than as employees' in order to further increase company profits," depriving them "of the protection of workers' compensation, the benefits of overtime pay, and meal and rest breaks." (*Ibid.*) They asserted violations of the California Labor Code, the California Business and Professional Code, and California Wage Orders. (*Ibid.*)

The *Yeomans* plaintiffs alleged they were each " 'required to sign identical, non-negotiable' " AMAs. (*Yeomans, supra,* 485 F.Supp.3d at

9

p. 1173.)  WFG moved to compel individual arbitration based on the arbitration provision contained in the AMA.  (*Id.* at pp. 1176–1177.)  The plaintiffs asserted they were not bound by the AMA's arbitration provision because "they received only the signature page of the AMA when they were being recruited to join WFG and never actually saw or received the entire AMA or the provision containing the arbitration agreement."  (*Id.* at p. 1178.)  Each admitted signing the signature page to the AMA, but they did so only after being " 'presented with a small packet of paper documents' " that did not contain a complete copy of the AMA.  (*Id.* at p. 1181.)

Thus, the *Yeomans* court first addressed whether a valid contract to arbitrate had been formed.  It found the application packet did not "contain information about the arbitration agreement or clearly refer the signatory to a full copy of the AMA or where a copy of that document might be found." (*Yeomans, supra,* 485 F.Supp.3d at p. 1179.)  However, WFG also presented evidence establishing the full AMA was available through its online portal beginning in 2016.  (*Id.* at p. 1181.)  All but one of the *Yeomans* plaintiffs conceded they had used DocuSign through the online portal, at some point after joining WFG, "to complete AMAs on behalf of new recruits."  (*Id.* at p. 1183.)  The court found "[t]hat [this] process would permit the user [a] clear opportunity to view all pages of the AMA" and thus all but one of the plaintiffs "agreed to the terms of the AMA" by continuing their work for WFG after an opportunity to review the full terms.  (*Ibid.*)  The court therefore concluded WFG had met its burden of demonstrating the existence of a valid contract.  (*Ibid.*)

Next, the *Yeomans* court considered the plaintiffs' alternative argument that the AMA's arbitration provision was unconscionable and unenforceable.  (*Yeomans, supra,* 485 F.Supp.3d at p. 1184.)  The court noted

10

WFG "concede[d] that there exists both procedural and substantive unconscionability, but they argue[d] that there is only minimal with respect to both." (*Ibid.*) After examining the formatting and content of the AMA and the arbitration provision, the court concluded the arbitration provision was procedurally and substantively unconscionable.[6] (*Id.* at pp. 1185–1189.) It further concluded "the AMA is permeated by both a substantial degree of procedural unconscionability as well as multiple substantively unconscionable provisions that are designed to confer an unfair unilateral advantage to [WFG], which serves to chill attempts by would-be plaintiffs to vindicate their rights." (*Id.* at p. 1190.) Accordingly, the district court declined to sever the unconscionable terms and denied WFG's motion to compel arbitration. (*Id.* at p. 1191.)

C.    *Sellers' Opposition to the Motion Compel Arbitration*

After *Yeomans* was decided, Sellers filed her opposition to WFG's motion to compel arbitration. She argued primarily that WFG was collaterally estopped from relitigating the enforceability of the AMA's arbitration provision already found to be unconscionable and unenforceable by the district court in *Yeomans*. She further asserted that, even without collateral estoppel, the arbitration provision was unenforceable because it was unconscionable, for the same reasons articulated by the court in *Yeomans*.

Sellers argued the arbitration provision was procedurally unconscionable because there was oppression in that the AMA was a contract of adhesion, and surprise because the "prolix printed form conceal[ed] the

---

[6]    We discuss the *Yeomans* court's analysis of unconscionability in further detail, *post*.

11

arbitration provision," which was "further exacerbated" by the arbitration provision's use of undefined terms and definitions located separately in the Glossary. She argued the arbitration provision was substantively unconscionable, for three reasons: (1) The arbitration provision was "one-sided" because, under the AMA's " 'Extraordinary Relief' " and " 'Equitable Relief' " clauses, only WFG had the option of opting out of arbitration for particular claims, while all associates were required to submit those same claims to arbitration. (2) The arbitration provision granted the arbitrator the authority to award attorney fees and costs to the prevailing party, "irrespective of whether the action was brought with merit." (3) The AMA contained choice of law and choice of venue provisions which mandated that all claims be filed in the state of Georgia, where WFG is headquartered, and apply Georgia law. Sellers argued, as the *Yeomans* court had found, that these provisions would serve to deter litigants who do not have the means to litigate in a foreign state. Finally, Sellers asserted the multiple, unconscionable terms "so permeate[ed]" the arbitration provision that "the only cure" was to void the entire arbitration provision.

D.     *WFG's Reply*

WFG disagreed it was collaterally estopped by the *Yeomans* decision from relitigating the enforceability of the AMA's arbitration provision. It asserted the *Yeomans* decision was not a final judgment on the merits and the issues litigated there were not identical to the issues in Sellers' case. As to a lack of identicality, WFG argued the court in *Yeomans* relied, at least in part, on its finding the *Yeomans* plaintiffs had not initially received a full and complete copy of the AMA. In contrast, Sellers conceded she had received and signed the complete AMA through DocuSign at the outset of her relationship with WFG.

12

E.    *The Trial Court's Ruling*

The trial court ruled on WFG's motion to compel arbitration on March 5, 2021.  It found the AMA's arbitration provision was governed by the FAA because it affected interstate commerce.  The court first ruled collateral estoppel did not apply because the *Yeomans* order was not " 'final and on the merits,' " at least in part because it was still subject to appeal.  On the merits, the trial court found the arbitration provision was procedurally and substantively unconscionable, and severance of the unenforceable terms was not appropriate.

In assessing procedural unconscionability, the trial court found the AMA was an adhesion contract, which WFG did not dispute.  The court, however, "note[d] that the small-font type used [in the AMA] does not suffice to establish procedural unconscionability" because "it appear[ed] [Sellers] could view the pages in any font size she wished" in DocuSign.  It further noted that "unlike *Yeomans*," Sellers did "not provide any evidence that she was not presented with the full agreement when she signed it."  But the court found that "the terms of the arbitration provision were found not only in the arbitration provision but also in the accompanying [G]lossary."  For that reason, the court stated it "must scrutinize the substantive terms."  In doing so, the trial court found the " 'Extraordinary Relief' and 'Equitable Relief' provisions, which only allow[ed] [WFG] the option of excluding [itself] from arbitration for certain claims" and the prevailing party provisions, which "does not consider whether an action is brought in bad faith," were both substantively unconscionable terms.

Finally, the trial court found severance was not appropriate.  The court explained:  "[I]n order to determine the terms of the arbitration agreement, one would have to look not only at the arbitration provision but also in the

13

accompanying [G]lossary. Indeed, the arbitration provision under [section] V is only one sentence, with all the remaining terms located in a separate document in multiple separate subparagraphs. In order to remove the unconscionable taint, the [c]ourt would need to reform the contract by stitching together the patchwork of terms. This the [c]ourt cannot do." Finding "that the unconscionability permeates the agreement," the court concluded severance was not appropriate and therefore denied WFG's motion to compel arbitration.

On March 25, 2021, WFG filed its notice of appeal.

F.    Yeomans *Is Affirmed*

On November 17, 2021, while this appeal was pending, the Court of Appeals for the Ninth Circuit affirmed the district court's order in *Yeomans*. (*Yeomans v. World Fin. Grp. Ins. Agency, LLC* (9th Cir. Nov. 17, 2021, No. 20-16937, No. 20-73758) 2021 WL 5356537 (*Yeomans II*).)[7] In its de novo review of the order denying WFG's motion to compel arbitration, the Ninth Circuit found both elements of procedural and substantive unconscionability present in the AMA's arbitration provision. Specifically, the *Yeomans* plaintiffs "show[ed] that there was surprise in the contracting process" and "that some of the terms were 'unreasonably favorable to [WFG,] the more powerful party.'" (*Id.* at p. *1.) "Moreover, given the relatively high degree of procedural unconscionability and multiple unconscionable provisions," the

---

[7]    WFG requests that we take judicial notice of the docket and Sellers requests that we take judicial notice of the briefing in *Yeomans II*. We have already granted a request to take judicial notice of the briefing in connection with a motion to stay submitted by WFG, and the docket is not necessary for resolution of this appeal. We therefore deny both requests. (See *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063; *County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29.)

14

court further agreed with the district court that severance was not appropriate "because the arbitration agreement lacked mutuality and 'the central purpose . . . [wa]s tainted' with an intent to deter [WFG] [a]ssociates, like plaintiffs, from enforcing their rights under California law." (*Ibid*.)

DISCUSSION

On appeal, WFG contends the trial court erred by finding the arbitration provision both procedurally and substantively unconscionable, and by declining to sever the unconscionable terms. In response, Sellers maintains that WFG is "collaterally estopped" from relitigating the enforceability of the AMA's arbitration provision in light of *Yeomans* and *Yeomans II*. She further maintains that, even if WFG is not "collaterally estopped," the *Yeomans* and *Yeomans II* decisions are persuasive authority and the arbitration provision is unconscionable and unenforceable against her for the same reasons articulated in *Yeomans*. On this latter contention, we agree with Sellers and find no error with the trial court's ruling. For that reason, we need not decide whether the doctrine of issue preclusion would bar WFG from relitigating the enforceability of the arbitration provision.[8]

Where there is no conflicting extrinsic evidence, "the validity of an arbitration clause, including whether it is subject to revocation as unconscionable, is a question of law subject to de novo review." (*Serpa v. California Surety Investigations, Inc.* (2013) 215 Cal.App.4th 695, 702

---

[8] "The law of preclusion helps to ensure that a dispute resolved in one case is not relitigated in a later case." (*Samara v. Matar* (2018) 5 Cal.5th 322, 326.) Although the parties, and the trial court, use the term "collateral estoppel," our high court has explained the "contours and associated terminology" associated with the doctrine "have evolved over time. We now refer to 'claim preclusion' rather than 'res judicata' [citation], and use 'issue preclusion' in place of 'direct or collateral estoppel' [citations]." (*Ibid*.)

(*Serpa*).) We review the trial court's decision whether to sever unconscionable portions of an arbitration agreement for abuse of discretion. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 122 (*Armendariz*); *Carmona v. Lincoln Millennium Car Wash, Inc.* (2014) 226 Cal.App.4th 74, 83 (*Carmona*).)

We have examined the AMA and the arbitration provision and, although we are not bound by the decisions of the federal appellate courts, we agree with the district court's observations of the AMA and the arbitration provision in *Yeomans*. We also find the court's analysis in *Yeomans* persuasive. (See *People v. Brooks* (2017) 3 Cal.5th 1, 90 [decisions of the federal appellate courts "may be considered for their persuasive weight"].) Accordingly, we independently conclude the arbitration provision is procedurally and substantively unconscionable, for largely the same reasons as the court did in *Yeomans*. We also find no abuse of discretion in the trial court's refusal to sever the unconscionable portions of the arbitration agreement.

## I.

### *General Legal Principles*

The parties agree the AMA is governed by the FAA. Under the FAA, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" (9 U.S.C. § 2.) The FAA reflects "both a 'liberal federal policy favoring arbitration,' [citation] and the 'fundamental principle that arbitration is a matter of contract.' " (*AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 339 (*AT&T Mobility*).)

16

Because arbitration is a matter of contract, the FAA "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.' " (*AT&T Mobility*, *supra*, 563 U.S. at p. 339, quoting *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687; accord *Armendariz*, *supra*, 24 Cal.4th at p. 114.) To determine the validity of an arbitration agreement, state law contract principles apply. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 ["In determining the rights of parties to enforce an arbitration agreement within the FAA's scope, courts apply state contract law while giving due regard to the federal policy favoring arbitration."]; accord *OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125–138 (*OTO*), cert. den. *sub nom. OTO, L.L.C. v. Ken Kho* (2020) ___ U.S. ____ [141 S.Ct. 85] [applying California state law regarding unconscionability and concluding "[t]he FAA thus contemplates that unconscionability claims, like other state law contract defenses, will be resolved before arbitration is enforced"].) And "[u]nder California law, courts may refuse to enforce any contract found 'to have been unconscionable at the time it was made,' or may 'limit the application of any unconscionable clause.' " (*AT&T Mobility*, at p. 340, quoting Civ. Code, § 1670.5, subd. (a).)

As the California Supreme Court has explained, " '[t]he unconscionability doctrine ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as " ' "overly harsh" ' " [citation], " 'unduly oppressive' " [citation], " 'so one-sided as to "shock the conscience" ' " [citation], or "unfairly one-sided" [citation]. All of these formulations point to the central idea that unconscionability doctrine is concerned not with "a simple old-fashioned bad bargain" [citation], but with terms that are "unreasonably favorable to the more powerful party"

[citation]. These include "terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms, or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction." ' " (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 910–911 (*Sanchez*).)

" '[U]nconscionability has both a "procedural" and a "substantive" element,' the former focusing on ' "oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' or ' "one-sided" ' results. [Citation.] 'The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz, supra,* 24 Cal.4th at p. 114.)

## II.

### *The Arbitration Provision is Procedurally Unconscionable*

As noted, procedural unconscionability focuses on oppression or surprise due to unequal bargaining power. (*Armendariz, supra*, 24 Cal.4th at

p. 114.) " 'Oppression' arises from an inequality of bargaining power which results in no real negotiation and 'an absence of meaningful choice.' " (*Zullo v. Superior Court* (2011) 197 Cal.App.4th 477, 484 (*Zullo*).) " ' " 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." ' " (*Ibid.*)

Both oppression and surprise due to unequal bargaining power are present here for many of the same reasons found by the court in *Yeomans*. (See *Yeomans*, *supra*, 485 F.Supp.3d. at pp. 1184–1187.) First, the AMA is a contract of adhesion and is, by its nature, oppressive. (See *Armendariz*, *supra*, 24 Cal.4th at p. 113 ["Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion."].) A contract of adhesion is a " 'standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " (*Ibid.*) The court in *Yeomans* found that "[a]t the moment in which the [WFG] application packets were presented, applicants 'had a stark choice: either sign the AMA signature page as part of the sign-up packet, or reject the agreement and not take the job.' " (*Yeomans*, at p. 1185.) The record in this case is also devoid of evidence suggesting Sellers, or any other associate, had any ability to negotiate the terms of the boilerplate AMA in WFG's standard employment application packet. We thus agree with the *Yeomans* court that " '[t]here was no meaningful opportunity to negotiate the terms of the agreement,' " "[n]or was there an option to opt out." (*Ibid.*)

WFG does not dispute the AMA is a contract of adhesion. Instead, it asserts that fact alone is not sufficient to establish procedural unconscionability, and "there are no other procedural factors pointing toward

19

unconsciconability." First, we note that WFG in *Yeomans* "concede[d] that there exists both procedural and substantive unconsciconability, but . . . argue[d] that there is only minimal with respect to both." (*Yeomans*, 485 F.Supp.3d at p. 1184.) Even in the absence of issue preclusion, it is dubious whether WFG can now assert there was *no* procedural unconsciconability in the AMA's arbitration provision. (See *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 [" 'Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.' "].)

Second, although "[t]he adhesive nature of the contract will not always make it procedurally unconsciconable," courts have generally acknowledged "adhesion contracts in the employment context typically contain some measure of procedural unconsciconability." (*Roman v. Superior Court* (2009) 172 Cal.App.4th 1462, 1470–1471, fn. 2 (*Roman*); *Marin Storage & Trucking, Inc. v. Benco Contracting and Engineering, Inc.* (2001) 89 Cal.App.4th 1042, 1054 ["we find no error in the trial court's conclusion that the Work Authorization and Contract was a contract of adhesion and, hence, procedurally unconsciconable"].) Further, as our high court recently explained in *OTO*, "[w]ith respect to *preemployment* arbitration contracts, we have observed that 'the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement.' " (*OTO, supra,* 8 Cal.5th at p. 127, quoting *Armendariz, supra,* 24 Cal.4th at p. 115.)

WFG relies on *Roman* to assert the adhesive nature of the arbitration provision is not enough to establish procedural unconsciconability, but even

20

the court in *Roman* found there was at least some level of "procedural unfairness . . . inherent in an adhesion agreement in the employment context." (*Roman*, *supra*, 172 Cal.App.4th at pp. 1470–1471.) The *Roman* court explained the "oppression typically inherent in adhesion contracts is minimal" when the bargaining power "is not grossly unequal and reasonable alternatives exist." (*Id*. at p. 1470, fn. 2.) But here, as we have discussed, the AMA containing the arbitration provision presented Sellers and others like her with " 'a stark choice:  either sign the AMA signature page as part of the sign-up packet, or reject the agreement and not take the job.' " (*Yeomans*, *supra*, 485 F.Supp.3d at p. 1185; accord *OTO, supra,* 8 Cal.5th at p. 127 [acknowledging the economic pressure exerted by employers in the context of preemployment arbitration contracts].) Thus, it cannot be said that the bargaining power was *not* grossly unequal or that Sellers had a reasonable alternative. The resulting oppression was not minimal.

We further disagree with WFG that no other procedural factors pointed toward unconscionability. There was strong indicia of surprise as well. Our independent review of the formatting and content of the AMA leads us to reach the same conclusion as the court did in *Yeomans*:  the key terms of the arbitration provision are hidden in the prolix of the AMA. (See *Yeomans*, *supra*, 485 F.Supp.3d at pp. 1185–1186; *Zullo, supra*, 197 Cal.App.4th at p. 484 [" ' " 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." ' "].)

As the *Yeomans* court observed, "although the heading of the AMA's arbitration provision is underscored in bold (like all other headings), the text

is in single-spaced, small-type font."[9] (*Yeomans, supra,* 485 F.Supp.3d at p. 1185.) To be exact, the text is in 9-point Times New Roman font. (See footnote 3, *ante*; see *Yeomans*, at p. 1185.) We also observe that the margins of the AMA are reduced to allow more text in each line, resulting in an overall denser appearance of the text. (*See* footnote 4, *ante*.) As noted by the court in *Yeomans*, our high court has found similarly-small, dense text to be "a paragon of prolixity," supporting a finding of surprise. (*OTO, supra,* 8 Cal.5th at pp. 119, fn. 4, 128 [finding an arbitration provision written in "extremely small font," between 7 and 8.5 points, spanning 51 lines on a single page to be the "paragon of prolixity"]; see *Yeomans*, at p. 1185.) We agree with the district court's observation "that '[a] layperson trying to navigate this block text, printed in tiny font, would not have an easy journey.'" (*Yeomans*, at p. 1186.)

We further agree with the district court that "[t]he prolix is further exacerbated by the arbitration provision['s] use of undefined terms, definitions of which are located elsewhere." (*Yeomans, supra,* 485 F.Supp.3d at pp. 1185–1186.) The arbitration provision in the AMA itself is just a single sentence, stating "[t]he Parties agree that, except as specifically provided to the contrary in this Agreement, any Grievance shall be resolved by Good Faith Arbitration." That sentence appears on page four of the AMA and page 10 of the application packet. The AMA does not define either of the capitalized terms, "Grievance" and "Good Faith Arbitration."

---

9     We note the heading of the arbitration provision, like other headings in the AMA, is in bold but is not underscored in the AMA executed by Sellers that is in the record. However, the parties agree the AMA at issue in *Yeomans* was the same as in this case.

We observe, as did the *Yeomans* court, the reader instead must turn another four pages to the Glossary—"a wholly separate document that is similarly single spaced and in small-scale font—to find the *general* definition of 'Good Faith Arbitration,' followed by seven separate terms and definition that make up good faith arbitration. Then, the reader must scroll further to uncover the definition of 'Grievance' in order to put it all together. Although these agreed-upon terms were not hidden *per se*, they were not contained within the AMA's arbitration provision, and a reader seeking to make sense of the arbitration provision would have to flip through a separate document in order to understand the extent to which they would be bound." (*Yeomans, supra*, 485 F.Supp.3d at p. 1186.) Further, although the Glossary refers to the " 'Rules' " of arbitration under the AMA, the rules are "not defined until near the end of the Glossary and even then makes reference to the AAA rules without a hyperlink or an instruction as to how to obtain them." (*Id.* at pp. 1186–1187.) Based on all these factors, we conclude there was a high degree of procedural unconscionability associated with Sellers' assent to arbitration. (See *id.* at p. 1187 [ "there was a significantly high degree of procedural unconscionability"].).)

WFG argues this case differs from *Yeomans* in two key respects which preclude a finding of procedural unconscionability. First, it asserts Sellers viewed the AMA electronically, while the *Yeomans* plaintiffs viewed the AMA in paper format. So it argues the trial court was correct in finding that Sellers could "view the pages in any font size she wished" and, thus, the "small-font type used does not suffice to establish procedural unconscionability." However, because we review unconscionability de novo, we are not bound by the trial court's analysis. (See *Serpa, supra,* 215 Cal.App.4th at p. 702.) We also do not agree with it.

23

As an initial matter, we note, contrary to WFG's assertion, the *Yeomans* plaintiffs did *not* "view" the AMA on paper. Although they initially received a paper packet, that packet did not include a complete copy of the AMA. (See *Yeomans, supra,* 485 F.Supp.3d at pp. 1179, 1182–1183.) Just like Sellers, the *Yeomans* plaintiffs' only opportunity to view the full AMA was *electronically*, when they subsequently accessed DocuSign to complete the application process for new recruits. (*Ibid*.) Thus, the court in *Yeomans* actually considered an electronic version of the AMA in its analysis of procedural unconscionability.

Further, we find no evidence in the record indicating the circumstances under which Sellers viewed the AMA, including what type of device she used, or establishing that the DocuSign platform allowed Sellers to "view the pages in any font size she wished." We acknowledge Sellers may have been able to adjust the size, or zoom, of the document on the screen of whatever device she may have used, but doing so would not change the formatting of the document or the fact that Sellers would have to search through numerous pages of dense text, spanning several documents, to find the pertinent terms of the arbitration provision. (See *OTO*, *supra*, 8 Cal.5th at p. 128 [considering density of text along with font size].)

Still, this asserted difference does not affect our independent analysis. The relevant question is whether the terms were hidden or, to put it another way, whether the contracting party would be surprised to learn of them. (See *OTO, supra*, 8 Cal.5th at p. 128; *Zullo, supra,* 197 Cal.App.4th at p. 484.) As we have already discussed, the arbitration provision and most notably its key substantive terms were spread out and essentially hidden within the AMA and the separate Glossary, which appeared only *after* the signature page to the AMA. Sellers would have to "scroll further" or "flip through" multiple

24

pages of both documents and "put it all together" in order to understand the extent to which she was bound by an arbitration provision. (*Yeomans*, *supra,* 485 F.Supp.3d at p. 1186.) As in *OTO*, "the agreement appears to have been drafted with an aim to thwart, rather than promote, understanding." (*OTO*, at p. 129.)

Second, WFG asserts the *Yeomans* court relied on the fact that the plaintiffs there, unlike Sellers, were not initially given the full AMA in its procedural unconscionability analysis. The *Yeomans* plaintiff argued there was surprise because "they were never presented with the full AMA, the arbitration provision it contained, or any hint that they were binding themselves to additional terms when the[y] signed the signature page contained in the WFG application packet, at least until sometime later they had notice of the AMA when they recruited others." (*Yeomans, supra*, 485 F.Supp.3d at p. 1185.) As we explained, the district court discussed these facts primarily in its analysis of contract formation. (See *id.* at pp. 1178–1184.) The court did reference these facts at the start of its procedural unconscionability analysis, finding that "[t]he AMA's rollout was plagued with an element of surprise due to all the reasons discussed above regarding formation." (*Id.* at p. 1185.) But it then focused the majority of its analysis of procedural unconscionability on the prolix and hidden terms. (See *id.* at pp. 1185–1187.) Thus, as a preliminary matter, we disagree with any assertion that the *Yeomans* plaintiffs' initial lack of a full copy of the AMA was dispositive in the district court's procedural unconscionability analysis.

At the same time, we acknowledge Sellers, unlike the *Yeomans* plaintiffs, was presented with a full copy of the AMA at the outset of her relationship with WFG. We consider the degree of procedural unconscionability in light of that difference, but conclude the distinction is

25

not significant.  The only question here is whether, and to what extent, the *degree* of procedural unconscionability is diminished by the fact that Sellers was presented with a complete copy of the AMA at the outset of her relationship with WFG.  In our view, any diminishment is minimal.  Even when given the full AMA, Sellers could not meaningfully negotiate the terms of the agreement.  Rather, she could only accept the agreement in its entirety or not take the job.  It would also not change the presence of surprise caused by the prolix of the AMA and hidden terms of the arbitration provision in the separate Glossary.

In sum, on our own independent review, considering *Yeomans* as persuasive authority, we conclude there was a high degree of procedural unconscionability based on the adhesive nature of the AMA and the significant degree of prolix and hidden terms related to the arbitration provision.

III.

*The Arbitration Provision is Substantively Unconscionable*

We turn now to whether any terms of the arbitration provision are substantively unconscionable.  This inquiry focuses on whether there are " ' "overly harsh" ' or ' "one-sided" ' results."  (*Armendariz, supra,* 24 Cal.4th at p. 114.)  Here, we conclude three terms render the arbitration provision substantively unconscionable.

First, section VI of the AMA regarding "**Extraordinary Relief**" entitled WFG exclusively the right to seek extraordinary relief to temporarily enjoin the associate if "any of the provisions of [the AMA] are violated by the [a]ssociate."  Section I, subpart 6, of the separate Glossary further addressed "Extraordinary Relief."  It entitled WFG exclusively "the right to seek preliminary and temporary restraining orders, injunctions and other

26

extraordinary relief . . . *without complying with [section] V of the Agreement"—the arbitration provision*, "or this Section I"—the " '<u>Good Faith Arbitration</u>' " provision. (Italics added.) And section D, subpart 7, of the Glossary regarding "<u>Equitable Relief</u>" required the associate to "agree[ ] that, in the event that he/she were to violate or threaten to violate any of the Covenants, WFG's recovery of damages would be inadequate to protect WFG. Accordingly, the [a]ssociate agrees that, in the event of a violation, actual or threatened, of any such Covenants, WFG shall be entitled to injunctive relief and specific performance, *notwithstanding any other provision of this Agreement to the contrary*." (Italics added.)

We conclude, as did the *Yeomans* court, that the terms entitling WFG, and WFG only, the right to initiate litigation to seek extraordinary relief under section VI of the AMA and equitable relief under section D, subpart 7 of the Glossary, without first complying with its own arbitration provision, to be overly one-sided. (See *Yeomans*, *supra*, 485 F.Supp.3d at pp. 1188–1189.) In addition to these two sections, there was a third similar term under section I, subpart 6, of the Glossary not considered by the *Yeomans* court, which itself defined "<u>Extraordinary Relief</u>" in a circular manner to include "other extraordinary relief (such [as] orders, injunctions and other relief referred to as 'Extraordinary Relief')." In California, "[c]ourts have found one-sided employer-imposed arbitration provisions unconscionable where they provide that employee claims will be arbitrated, but the employer retains the right to file a lawsuit in court for claims it initiates, or where only the types of claims likely to be brought by employees (wrongful termination, discrimination etc.) are made subject to arbitration." (*Serafin v. Balco Properties, Ltd., LLC* (2015) 235 Cal.App.4th 165, 181 (*Serafin*).)

27

Applying California law, the *Yeomans* court found "the one-sidedness of arbitration [in the AMA] is even more stark. This is not the case where, *e.g.*, either party can seek an injunction to force compliance with a confidentiality clause—where there is facial mutuality but results in a de facto advantage to the employer. Here, the one-sidedness is *facial*." (*Yeomans*, *supra*, 485 F.Supp.3d at pp. 1187–1188.) The *Yeomans* court found these terms were " 'designed to allow [WFG]—and [WFG] only—the option of circumventing the arbitration process for the claims they felt were important enough to them to go the extreme position of excluding themselves from arbitration for those claims, while requiring all employees to submit those very claims to the arbitration process.' " (*Id.* at p. 1187.) We agree, and also conclude these terms are substantively unconscionable. (See *Serafin*, *supra*, 235 Cal.App.4th at p. 181.)

WFG asserts the California Supreme Court rejected the argument that a similar provision was unconscionable in *Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1241, 1246–1248 (*Baltazar*). *Baltazar* is inapposite. The arbitration provision at issue in *Baltazar* was *mutual* and based specifically on California statutory law. The provision stated: " 'Pursuant to California Code of Civil Procedure [section] 1281.8 either party hereto may apply to a California court for any provisional remedy, including a temporary restraining order or preliminary injunction.' " (*Id.* at p. 1241.) Code of Civil Procedure section 1281.8, in turn, defines " 'provisional remedy' " to include attachments and temporary protective orders, writs of possession, preliminary injunctions, temporary restraining orders, and the appointment of a receiver. (Code Civ. Proc., § 1281.8, subd. (a).) Subdivision (b) provides, "[a] party to an arbitration agreement may file in the court in the county in which an arbitration proceeding is pending . . . an application for a

28

provisional remedy in connection with an arbitrable controversy, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without provisional relief." (*Id.*, subd. (b).) The Court in *Baltazar* "accept[ed] for the sake of argument that employers are, in general, more likely than employees to seek provisional relief during the pendency of an arbitration," but concluded the provision was not substantively unconscionable because it did "no more than recite the procedural protections already secured by [Code of Civil Procedure] section 1281.8[, subdivision] (b)." (*Baltazar,* at p. 1247.)

WFG concedes the extraordinary and equitable relief provisions at issue here are *not* mutual and, instead, apply only to WFG. WFG nevertheless asserts the analysis in *Baltazar* is instructive because the provisions here likewise do no more than confirm WFG's statutory rights. We disagree. None of the terms regarding extraordinary or equitable relief in the AMA's arbitration provision are expressly limited to the provisional relief set forth in Code of Civil Procedure section 1281.8. Rather, section I, subpart 6, of the separate Glossary is expressly unlimited and allows WFG "to seek preliminary and temporary restraining orders, injunctions and *other extraordinary relief,*" without explaining what that "other extraordinary relief" might be. (Italics added.) Further, if the intent of these terms was simply to "recite the procedural protections already secured by [Code of Civil Procedure] section 1281.8(b)," there would be no reason to make the terms unilateral.[10] (*Baltazar, supra*, 62 Cal.4th at p. 1247.) Further still, as we

_____

10     At oral argument, WFG's counsel agreed the extraordinary relief provision "reads as a one-way provision," but asserted, for the first time, "the agreement also says the AAA commercial arbitration rules would apply and the AAA commercial arbitration rules allow either party to do that [i.e., seek

29

will discuss, the AMA specified arbitration would occur in accordance with Georgia law, rendering Code of Civil Procedure section 1281.8, and the mutual relief specified by the statute, inapplicable.

Second, section IX, subpart J, of the AMA regarding "**Miscellaneous**" provided that if any party "commences an action or arbitration to enforce any of the provisions hereof, the prevailing Party in such action shall be entitled to an award of its reasonable attorneys' fees and all costs and expenses incurred in connection therewith." As the *Yeomans* court noted, "California courts have previously disapproved of mandatory fee and cost provisions where a plaintiff who failed to prevail on similar claims in court would be responsible for attorney[ ] fees only where the action was 'frivolous, unreasonable, without foundation, or brought in bad faith.' " (*Yeomans, supra*, 485 F.Supp.3d at p. 1188, quoting *Trivedi v. Curexo Technology Corp.* (2010) 189 Cal.App.4th 387, 394 (*Trivedi*), disapproved on other grounds in *Baltazar, supra,* 62 Cal.4th at pp. 1246–1247.)

In *Trivedi*, the Court of Appeal addressed a fee provision that "allow[ed] for the recovery of attorney fees and costs by the prevailing party

---

extraordinary relief]." Thus, counsel asserted, the provision "simply purports to grant a contractual right to WFG which is a right already afforded by the commercial arbitration rules." While the AAA rules do provide a mechanism for either party to seek emergency relief *from the arbitrator*, they do not afford Sellers the same broad relief WFG is entitled to under the admittedly one-sided extraordinary relief provision in the AMA. Reference to the AAA rules—which WFG further concedes were not attached to the AMA—does not support WFG's position and, instead, simply injects further ambiguity into the arbitration provision of the AMA. Now, Sellers would be required to search for a wholly separate document and view an additional 46 pages of mostly single-spaced text to fully understand what she was assenting to with regards to arbitration. Reference to the AAA rules only increases the overall procedural unconscionability and, as we discuss next, makes severance even less feasible.

in an arbitration." (*Trivedi, supra*, 189 Cal.App.4th at p. 394.)  The plaintiff brought an action for discrimination in violation of the Fair Employment and Housing Act (FEHA), which provides " 'a prevailing defendant may recover attorney fees only when the plaintiff's action was frivolous, unreasonable, without foundation, or brought in bad faith.' " (*Ibid.*)  The *Trivedi* court concluded the fee provision there was substantively unconscionable because it did not limit the defendant's right to recover fees from the plaintiff in accordance with FEHA.  (*Id.* at p. 395.)

Here, Sellers brought claims, among others, under the Labor Code for the nonpayment of wages.  Section 218.5 provides:  "In any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney[ ] fees and costs to the prevailing party. . . .  However, if the prevailing party in the court action is not an employee, attorney[ ] fees and costs shall be awarded pursuant to this section *only if the court finds that the employee brought the court action in bad faith.*"  (Italics added.)  The fee provision in the AMA, however, simply awards fees to the prevailing party, and does not contain a bad faith requirement.

Just as in *Trivedi*, the fee shifting provision in the AMA "lessen[ed] [Sellers'] incentive to pursue claims deemed important to the public interest, and weaken[ed] the legal protection provided to plaintiffs who bring nonfrivolous actions from being assessed fees and costs." (*Trivedi, supra*, 189 Cal.App.4th at p. 395; accord *Ajamian v. CantorCO2e, L.P.* (2012) 203 Cal.App.4th 771, 800 [finding fee provision unconscionable where it imposes the obligation to pay attorney fees where the plaintiff "would have no such obligation under at least one of her California statutory claims"].)  WFG asserts *Trivedi* is not instructive here because the fee-shifting provision in

31

the AMA applies to breach of contract claims only. To the contrary, the fee provision applies to any "action or arbitration to enforce any of the provisions [of the AMA]," and the AMA, in turn, governs essentially all aspects of Sellers' relationship with WFG, including, notably, the "**Associate's Compensation**."

Third, section VI of the AMA regarding "**Extraordinary Relief**" entitled WFG exclusively the right to seek extraordinary relief "in the federal and state courts of the State of Georgia, in any court of competent jurisdiction outside the State of Georgia, as well as in Good Faith Arbitration and if justice requires, in more than one of them, *all without having to first comply with the requirements of [section] V*"—the arbitration provision. (Italics added.) As the *Yeomans* court noted, WFG is headquartered in Georgia and so "[t]he burden imposed on individual plaintiffs is obvious." (*Yeomans*, *supra*, 485 F.Supp.3d at p. 1189.) The court concluded "the provision mandating all court litigation to occur in the state of [WFG's] headquarters, as well as the application of Georgia law, to be unduly one-sided such that it would serve as a deterrent to litigants who otherwise do not have the means to litigate in a foreign state." (*Ibid*.) We agree.

WFG asserts Sellers provides no authority finding a choice of law or forum selection clause unconscionable. But WFG again neglects to address the analysis in *Yeomans*, which is, itself, persuasive authority. Moreover, other courts in California have found similar choice of law or forum selection clauses substantively unconscionable. For example, the court in *Pinela v. Neiman Marcus Group, Inc.* (2015) 238 Cal.App.4th 227, found a provision requiring the application of Texas law against a California plaintiff to be substantively unconscionable because "on its face [it] disable[d] California substantive law, undermining [the plaintiff's] claims on the merits. Since

32

[the plaintiff's] wage-and-hour claims [were] specifically founded on California statutory law, [the choice of law provision] work[ed] a substantial injustice on him as a citizen of California." (*Id*. at pp. 246–249, 251; accord *Samaniego v. Empire Today, LLC* (2012) 205 Cal.App.4th 1138, 1149 (*Samaniego*) [concluding Illinois choice of law provision "would result in substantial injustice" because "Illinois law might require enforcement of [the] arbitration clause"].) The same is true here. Sellers asserts WFG subjected her to non-compete, non-solicitation, and choice of law and forum provisions in violation of section 925 and Business and Professions Code section 16600. Beyond serving as a deterrent to litigation, the choice of law and forum clauses in the AMA's arbitration provision would directly undermine Sellers' substantive claims under California law.

In sum, we independently conclude, like the *Yeomans* court, that there are at least three terms that cause the AMA's arbitration provision to be substantively unconscionable. Where there is both procedural and substantive unconscionability, "[a] sliding scale is applied so that ' " 'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' " ' " (*Serafin*, *supra*, 235 Cal.App.4th at p. 178; accord *Armendariz*, *supra*, 24 Cal.4th at p. 114; see *Yeomans*, 485 F.Supp.3d at p. 1189.) Here, for the reasons we have discussed, we conclude there is a high degree of procedural unconscionability. Although this in turn requires less evidence of substantive unconscionability to render the arbitration provision unenforceable, we agree with the *Yeomans* court that with three overly-harsh or overly one-sided, employer-imposed terms, the AMA's arbitration provision has "far more than a low degree of substantive unconscionability." (*Yeomans*, at p. 1189.) Ultimately, our independent

33

review of the AMA and its arbitration provision leads us to conclude the terms "are 'unreasonably favorable to the more powerful party.' " (*Sanchez, supra,* 61 Cal.4th at p. 911.) Thus, we also conclude the arbitration provision is unenforceable unless the unconscionable terms can be severed. We turn to this question next.

## IV.

### *The Trial Court Did Not Abuse Its Discretion*
### *in Declining to Sever the Unconscionable Terms*

WFG argues the trial court abused its discretion in declining to sever any unconscionable terms and enforce the remainder of the arbitration provision. We find no abuse.

Once the trial court determines any portion of an arbitration provision is unconscionable, it has discretion to find the entire provision unenforceable, or to sever or limit any unconscionable terms and enforce the remainder of the contract. (See Civ. Code, § 1670.5, subd. (a) ["If the court . . . finds the contract or any clause of the contract . . . unconscionable . . . the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."]; see *Armendariz, supra,* 24 Cal.4th at pp. 121–122; *Yeomans, supra,* 485 F.Supp.3d at p. 1189.) We review the trial court's discretionary decision whether to sever unconscionable portions of an arbitration provision for an abuse of that discretion. (See *Armendariz,* at p. 122; *Carmona, supra,* 226 Cal.App.4th at p. 83.)

The California Supreme Court in *Armendariz* explained a trial court may refuse to enforce a contract, or provision, as a whole if it is " 'permeated' by the unconscionability," and addressed "precisely what it means for an

agreement to be permeated by unconscionability." (*Armendariz, supra,* 24 Cal.4th at p. 122.) Considering "[t]he basic principles of severability that emerge from [the underlying statutes] and the case law," the *Armendariz* Court explained: "Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." (*Id.* at p. 124.) The Court found two specific factors weighed against severance of the terms at issue there. (*Ibid.*) First, "multiple defects indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage." (*Ibid.*) "Second, in the case of the agreement's lack of mutuality, such permeation is indicated by the fact that there is no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement." (*Id.* at pp. 124–125.)

Considering those factors, both the trial court in this case and the district court in *Yeomans* concluded, though for slightly different reasons, that severance of the unconscionable terms in the AMA's arbitration provision was not appropriate. (See *Yeomans, supra*, 485 F.Supp.3d at p. 1191.) We reach the same conclusion. As we have discussed, there were at least three substantively unconscionable terms in the AMA that defined the scope and terms of arbitration, and they appeared in multiple locations in the AMA itself and in the separate Glossary. (See *Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 254 [finding an arbitration provision with three unconscionable terms "was permeated with unconscionability"].) There was not one single term the trial court could "strike or restrict in order to remove

35

the unconscionable taint from the agreement." (*Armendariz, supra,* 24 Cal.4th at pp. 124–125.) As the trial court concluded, "[i]n order to remove the unconscionable taint, the [c]ourt would need to reform the contract by stitching together the patchwork of terms" in two separate documents.

Further still, the "multiple defects demonstrat[ed] a systemic lack of mutuality" that favored WFG. (*Carmona, supra,* 226 Cal.App.4th at p. 90.) The *Yeomans* court concluded the AMA's arbitration provision was "designed to confer an unfair unilateral advantage to [WFG]," and "to chill attempts by would-be plaintiffs to vindicate their rights." (*Yeomans, supra,* 485 F.Supp.3d at p. 1190.) We also conclude the unconscionable terms evidenced "a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage." (See *Armendariz, supra,* 24 Cal.4th at p. 124; *Samaniego, supra,* 205 Cal.App.4th at p. 1149 [finding no abuse of discretion in declining to sever unconscionable terms where " ' "multiple defects indicate a systematic effort to impose arbitration" ' "].)

Accordingly, we find no abuse of discretion in the trial court's refusal to sever the unconscionable terms. Because we affirm the trial court's order denying the motion to compel arbitration, we need not address WFG's remaining assertions the trial court should dismiss the class claims and stay the PAGA claims.

DISPOSITION

The trial court's order denying the motion to compel arbitration is affirmed. Sellers is awarded her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:


IRION, Acting P. J.


DATO, J.